906 P.2d 742

George S. YARDMAN, Plaintiff–Appellee and Cross–Appellant,

v.

SAN JUAN DOWNS, INC., a New Mexico Corporation, and Board of County Commissioners of San Juan County, Defendants–Appellants and Cross–Appellees.

No. 11888.

Court of Appeals of New Mexico.

Aug. 23, 1995.

Certiorari Denied Oct. 26, 1995.

David Duhigg, Duhigg, Cronin & Spring, P.A., Albuquerque, for Plaintiff–Appellee and Cross–Appellant.

Mark L. Ish, Carol J. Ritchie, Mariana G. Geer, Felker & Ish, P.A., Santa Fe, for Defendants–Appellants and Cross–Appellees.

Tom Udall, Attorney General, Randall W. Childress, Deputy Attorney General, Santa Fe, Sorenson & Schutte, P.C., By: Stephen J. Rhoades, Special Assistant Attorney General, Albuquerque, for Amicus Curiae, Risk Management Div., General Services Dep't of State of N.M.

William H. Carpenter, Chairman, Amicus Committee, New Mexico Trial Lawyers Ass'n, Michael B. Browde, Albuquerque, for Amicus Curiae, New Mexico Trial Lawyers Ass'n.

## OPINION

DONNELLY, Judge.

1. Defendants, San Juan Downs, Inc. and the Board of County Commissioners of San Juan County (the County) appeal, and Plaintiff, George S. Yardman, cross-appeals, from the judgment entered by the trial court following a trial by jury. This cause was initially certified to the New Mexico Supreme Court; however, by order dated June 29, 1995, that Court remanded certain of the issues posed by the appeal and cross-appeal to this Court for resolution.

2. Defendants' appeal raises seven issues: (1) whether the trial court erred in refusing Defendants' requested jury instructions on comparative fault and standard of care, and in giving Plaintiff's requested instruction concerning insurance and taxes; (2) whether the trial court erred in allowing certain opinion testimony and evidence of Defendants' subsequent remedial action following the accident; (3) whether Plaintiff presented a prima facie case of negligence warranting submission of the case to the jury; (4) whether the conditions which caused Plaintiff's injuries were design defects for which there was no waiver of sovereign immunity; (5) whether comments by the trial court were improper; (6) whether the trial court erred in failing to permit an offset for the amount of medical and disability insurance policies purchased by the County; and (7) whether each of the errors complained of combined to constitute cumulative error.

3. Plaintiff's cross-appeal presents four issues involving the constitutionality of NMSA 1978, Section 41–4–19(A) (Repl.Pamp. 1989), imposing a statutory cap on the amount of damages that may be awarded in an action under the New Mexico Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27

(Repl.Pamp.1989 & Cum.Supp.1995). These issues are still presently pending before our Supreme Court. The decision reached by us today, however, obviates the need to address the constitutional issues in the present appeal. In considering Plaintiff's cross-appeal, we discuss: (1) whether the Tort Claims Act permits an award of post-judgment interest on money judgments against governmental entities and public employees; and (2) whether the term "single occurrence," as used in the Tort Claims Act, permits a court to determine that there were two proximate causes which resulted in Plaintiff's injuries so as to permit the doubling of the $300,000 statutory damage cap imposed under the Act.

4. For the reasons discussed herein, we reverse and remand.

*FACTS*

5. Plaintiff, a jockey at San Juan Downs, was injured on April 19, 1987, during a race when the horse he was riding suddenly swerved causing him to be thrown from his horse and strike a post and track railing. As a result of his fall, Plaintiff suffered substantial injuries to his head and neck. At the time of the accident, the race track was owned by the County.

6. Plaintiff filed suit against San Juan Downs and the County. Plaintiff alleged that his injuries were caused by the County's negligence in the construction, operation, and maintenance of the track rails and posts. At trial, Plaintiff presented evidence tending to show that (1) the type of track rails enclosing the track were dangerous, and (2) the County negligently maintained an opening in the rail where the horses could exit. The County denied any negligence and argued that, at most, the matters complained of by Plaintiff were design defects for which there has been no waiver of sovereign immunity. The trial court denied the County's motion for summary judgment on its claim that Plaintiff's injuries stemmed from a design defect.

7. The jury found an absence of any negligence on Plaintiff's part, that Defendants were 100% negligent, and that Plaintiff should be awarded $400,000 in damages. Because of the $300,000 limitation imposed under former Section 41–4–19(A)(2) of the Tort Claims Act on the amount of damages that could be awarded, the trial court reduced Plaintiff's damage award to $300,000.

*DEFENDANTS' APPEAL*

*1. Jury Instructions*

8. Defendants' initial issue raised on appeal involves first, a claim of error arising out of the trial court's denial of a requested instruction tendered by Defendants, and second, a challenge to a jury instruction submitted by Plaintiff which was given by the trial court over Defendants' objection.

*(a) Instruction Re Voluntary Exposure
to Known Danger*

■ 9. Defendants' answer to Plaintiff's complaint denied any negligent acts or omissions on its part and raised as an affirmative defense that "[t]he injuries, if any, complained of by Plaintiff occurred as a direct and proximate result of Plaintiff's own negligent conduct, which precludes Plaintiff's recovery herein or reduces it by that percentage extent attributable to his own negligence in accordance with the law of comparative fault."

10. At trial, Defendants tendered a proposed jury instruction based on SCRA 1986, 13–302C (Repl.1991), stating that Defendants denied any negligence on their part and that Plaintiff himself was negligent in two respects. Defendants' requested instruction stated in part that Defendants "ha[d] the burden of proving at least one of the following contentions: 1. That [Plaintiff] was careless or inattentive in the manner in which he rode his horse[, and] 2. That [Plaintiff] was aware of or had reason to know of the type of rail used at San Juan Downs." The trial court refused Defendants' tendered instruction but did give another instruction which covered Defendants' claim that Plaintiff was "careless or inattentive in the manner in which he rode his horse."

11. Defendants contend on appeal that the trial court erred in refusing their tendered instruction that required the jury to consider both of its comparative negligence theories and its claim that Plaintiff was negligent in riding a horse at the track when he was "aware of or had reason to know of the type of rail used at San Juan Downs." De-

fendants rely in part on *Thompson v. Ruidoso–Sunland, Inc.*, 105 N.M. 487, 734 P.2d 267 (Ct.App.1987), in support of their claim that the trial court should have permitted the jury to compare Plaintiff's fault, if any, in riding at the track when, purportedly, he knew or should have known that the track rail constituted a hazard and voluntarily exposed himself to a known danger. In *Thompson*, similar to the factual situation involved in the instant case, the plaintiff was a jockey who was injured when she fell from a horse and was thrown against the track rail. In her cross-appeal, Thompson argued that the trial court erred in apportioning negligence based on the defendant's assertion that she voluntarily assumed the risk inherent in falling or being thrown from a horse in such manner so that she struck the track rail.

12. The *Thompson* Court held: "Plaintiff ... also challenges the trial court's findings on the apportionment of negligence. There is ample evidence in the record to support the trial court's apportionment of negligence. *See Marcus v. Cortese*, 98 N.M. 414, 649 P.2d 482 (Ct.App.1982)." *Thompson*, 105 N.M. at 490, 734 P.2d at 270. Judge Alarid, speaking for the Court, also noted:

> In her cross-appeal, plaintiff argues that she should not have been held to be negligent to any extent.... As we have already pointed out, there was evidence from which the trial court [sitting without a jury] could and did conclude that plaintiff voluntarily encountered a known danger. Plaintiff's rejoinder is that she was economically coerced into riding at defendant's track, because if she was to pursue her trade as a jockey, she must do so at a race track. The existence and weight[, however,] to be given to extenuating circumstances are questions of fact.

*Thompson*, 105 N.M. at 492, 734 P.2d at 272. We think the rationale articulated in *Thompson* concerning the necessity of the fact finder to apportion the amount of fault, if any, based on the plaintiff's purported voluntary exposure to a known hazard is also applicable in the instant case.

13. Plaintiff argues that *Thompson* does not apply here, however, because there was insufficient evidence to warrant giving De-

fendants' requested instruction. Our review of the record leads us to a contrary conclusion. Defendants raised as an affirmative defense their claim that Plaintiff's conduct was negligent, thus precluding any recovery "or reduc[ing] it by that percentage extent attributable to his own negligence in accordance with the law of comparative fault."

14. Defendants also presented evidence indicating that Plaintiff rode in approximately seventy-five races at San Juan Downs prior to his accident and had been around the track for a period of approximately three years. Other witnesses, including Plaintiff, testified that prior to his accident Plaintiff had ridden in seventeen races in Grand Junction, Colorado. Plaintiff had also ridden at other tracks in New Mexico: four in Raton, one in Santa Fe, and two in Albuquerque. Additionally, Defendants presented the testimony of two jockeys, who voiced their opinion that because of the number of races Plaintiff participated in at San Juan Downs and other tracks, he should have been aware of any hazards posed by the condition of the track and its rail.

15. Defendants contend this was sufficient to create a factual issue concerning whether Plaintiff was reasonably placed on notice of the nature and hazard presented by the track rail and track condition so as to warrant submission of their requested instruction to the jury to enable it to evaluate Defendants' comparative negligence defense and the apportionment, if any, of fault. *Cf. Broome v. Byrd*, 113 N.M. 38, 42–43, 822 P.2d 677, 681–82 (Ct.App.1991) (issue of whether a hazard should have reasonably been anticipated and amount, if any, of comparative fault to be assessed against the plaintiff are factual issues to be resolved by fact finder). A party is entitled to an instruction on its theory of the case when there is evidence to support such instruction. *See Lamkin v. Garcia*, 106 N.M. 60, 64, 738 P.2d 932, 936 (Ct.App.), *cert. denied*, 106 N.M. 7, 738 P.2d 125 (1987); *McNeely v. Henry*, 100 N.M. 794, 800, 676 P.2d 1359, 1365 (Ct.App. 1984). Based upon the matters listed above, we think it is clear that Defendants presented sufficient evidence in the instant case so as to require the submission of an instruction

on this aspect of Defendants' claim of comparative negligence. *See Thompson,* 105 N.M. at 490, 734 P.2d at 270. The trial court's refusal to give Defendants' requested instruction necessitates reversal and remand for a new trial.

16. Although our disposition of this issue requires that this case be reversed and remanded for a new trial, in furtherance of judicial economy we address other claims raised by the parties that may arise on retrial.

(b) *Instruction Re Taxes and Insurance*

■ 17. Defendants also complain that the trial court erred in giving an instruction, patterned in part upon SCRA 1986, 13–208 (Repl.1991), which stated that the jury was not to consider whether the County had insurance or the effect of its verdict on county taxes. This instruction was given because during voir dire the subject of insurance came up in the responses given by several prospective jurors. In response to questioning on voir dire, one prospective juror voiced a concern that insurance premiums might be increased if a large verdict were rendered. Because this statement occurred within the hearing of some of the other prospective jurors, who were subsequently selected to serve on the jury, we find no impropriety in the trial court's granting of Plaintiff's requested jury instruction which advised the jury that whether a party is insured should have no bearing on the verdict which is rendered. *Cf. Safeco Ins. Co. v. United States Fidelity & Guar. Co.,* 101 N.M. 148, 152, 679 P.2d 816, 820 (1984) (where subject of insurance has been brought to the attention of the jury, the party whose coverage has been disclosed may request instruction admonishing jury that existence of insurance has no bearing on issue of liability or the amount, if any, of liability).

■ 18. In the instant case, Plaintiff also requested that a modified form of a jury instruction based on SCRA 13–208 be given so as to contain an admonition that the jury should not concern itself with the "tax consequences" of its verdict. Over Defendants' objection, the trial court gave this instruction. Defendants argue that the instruction

on taxes was not warranted and had the effect of misleading the jury and injecting a false issue into the case. We disagree. On voir dire, one of the prospective jurors voiced concern about the effect an award of damages against the County might have on taxpayers in general. Although the juror was excused for cause, considering that the statement occurred within the hearing of other panel members, the trial court could properly conclude that the instruction was necessary in order to neutralize the effect of such comments.

2. *Admission of Remedial and Opinion Evidence*

(a) *Remedial Action*

■ 19. Plaintiff presented evidence indicating that at the time of the accident, the race track had a path across one end of the infield leading to the track. The path was used during races to lead the horses from the barn and the paddock area. During races, the opening of the track railing was closed by installing a section of railing.

20. Moments before Plaintiff's accident, the horse he was riding veered toward the rail near the place where the infield path met the track. Both Plaintiff and Defendants presented testimony concerning the location and use of the infield path and the effect, if any, this had upon the horse ridden by Plaintiff at the time of his accident. Plaintiff contended that although at race time access to the path was blocked, nevertheless, the location of the path was a factor which caused his mount to suddenly swerve toward the place where the horses were accustomed to returning to the stable area. During Defendants' case-in-chief, Hank Demoney, the County's track manager, testified that he did not believe the infield path or gap constituted a dangerous situation. Over Defendants' objection, the trial court permitted Plaintiff to cross-examine Demoney concerning subsequent remedial measures made by Defendants involving the relocation of the path.

21. SCRA 1986, 11–407 (Repl.1994) provides:

When, after an event, measures are taken which, if taken previously, would have

made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.

Plaintiff asserts that evidence of subsequent changes in the track was admissible, among other things, to impeach Demoney concerning his belief that the path did not present a hazard.

■ 22. One of the basic purposes of SCRA 11–407 is to encourage a party to initiate and implement steps to promote safety by removing the disincentive to make repairs or modifications following an accident, which would otherwise exist if the accident victim could readily introduce evidence of such changes as evidence of a defendant's negligence. *See Probus v. K–Mart, Inc.,* 794 F.2d 1207, 1210 (7th Cir.1986) (Fed.R.Evid. 407); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 469 (7th Cir.1984). *See generally* Thomas M. Fleming, *Admissibility of Evidence of Repairs, Change of Conditions, or Precautions Taken After Accident—Modern State Cases,* 15 A.L.R.5th 119 (1993 & Supp. 1994).

■ 23. Although evidence of remedial measures may properly be admitted for impeachment purposes, nevertheless, the decision of whether to admit such evidence must be carefully balanced by the trial court in order to determine whether the probative value of such evidence outweighs the possibility of unfair prejudice, confusion of the issues, or misleading the jury. *See SCRA* 1986, 11–403 (Repl.1994).

■ 24. We agree with Defendants that merely because a defendant denies that it was negligent and contends that it acted in a reasonable manner does not automatically open the door for the admission of evidence of remedial action under the impeachment exception and allowance of testimony, and the impeachment exception must be carefully evaluated so as not to negate the underlying purpose of the rule. Therefore, "the trial judge should guard against the improper admission of evidence of subsequent remedial measures to prove prior negligence under the guise of impeachment." 10 James Wm. Moore, *Moore's Federal Practice* § 407.04, at IV–159 (2d ed. 1995). "[T]he fact that the proof can be introduced for impeachment purposes invites courtroom 'games.'" 2 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 127, at 26 (2d ed. 1994). Trial counsel should not be allowed to set up a Hobson's choice whereby the witness must admit that the condition was unsafe or be impeached with evidence that subsequent remedial measures were implemented. *See id.* As observed in *Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.,* 773 F.2d 783, 792 (7th Cir.1985) (quoting *Flaminio,* 733 F.2d at 468), the impeachment exception "must be applied with care, since 'any evidence of subsequent remedial measures might be thought to contradict and so in a sense impeach [a party's] testimony that he was using due care at the time of the accident.... [I]f this counted as "impeachment" the exception would swallow the rule.'" *See also Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560, 1567 (11th Cir.1991) (impeachment exception must be applied with care to avoid defeating rule's purpose); 1 Jack B. Weinstein et al., *Weinstein's Evidence,* ¶ 402[04] (1995).

25. The Court applied these principles in the context of impeachment through changed conditions in *Cumming v. Nielson's, Inc.,* 108 N.M. 198, 769 P.2d 732 (Ct.App.), *cert. denied,* 108 N.M. 97, 766 P.2d 1331 (1988). Cumming sued for personal injury and property damage resulting from a head-on collision. *Id.* at 199, 769 P.2d at 733. The highway where the accident occurred was under construction, *id.* at 200, 769 P.2d at 734, and the plaintiff moved to introduce photographs taken three weeks after the accident, arguing "under the 'feasibility of precautionary measures' exception to SCRA 1986, 11–407, and that they were relevant for impeachment purposes." *Id.* at 204, 769 P.2d at 738. We affirmed the trial court's refusal to admit this evidence because the photographs of subsequent remedial measures would not be relevant to impeach the testi-

mony of the defendant's witnesses as to the condition of the area on the night of the accident. *Id.*

26. In the present case, Mr. Demoney stated that, in his opinion, the rail, the path, and the gate were not "dangerous." He further testified that he believed that the fact that Plaintiff shifted his weight had the effect of altering the direction of the horse. Absent other evidence, these opinions, however, do not constitute a sufficient basis to ignore the raison d'etre of SCRA 11–407 so as to permit the admission of subsequent remedial measures under the impeachment exception. *See Hardy v. Chemetron Corp.,* 870 F.2d 1007, 1011 (5th Cir.1989) ("Evidence of subsequent remedial measures is no more admissible to rebut a claim of non-negligence than it is to prove negligence directly."). We do not, however, mean to imply that Plaintiff may not seek to have such evidence admitted in the second trial for any legitimate purpose that the record will support, including impeachment. Moreover, as noted by the authors of *Weinstein's Evidence, supra,* ¶ 407[05], at 407–40: "Before permitting the use of … evidence for impeachment, the trial court should ascertain whether the general standards for admissibility under Rules 401 and 403 are met."

### (b) *Opinion Evidence*

27. Defendants also challenge the propriety of the trial court's ruling permitting a veterinarian, Dr. Bonnie Beever, to give opinion testimony concerning the behavior of the horse ridden by Plaintiff. Dr. Beever opined that Plaintiff's horse suddenly veered toward the infield rail at the point near where the path leading across the infield met the race track because horses are creatures of habit and the horse associated that path with returning to the barn.

28. Defendants objected to Dr. Beever's testimony on the grounds of lack of foundation and that such opinion lacked proper scientific reliability. We discern no error in the admission of this evidence. Under SCRA 1986, 11–702 (Repl.1994), the trial court may permit a person, who has been recognized as an expert, to testify where such opinion involves a matter of scientific, technical, or other specialized knowledge, and such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *See also* SCRA 1986, 13–213 (Repl.1991); *State v. Smith,* 80 N.M. 126, 130, 452 P.2d 195, 199 (Ct.App.1969).

29. Determination of whether a witness should be recognized as an expert is a decision within the sound discretion of the trial court, and its ruling on this issue will not be reversed absent a showing of an abuse of discretion. *Madrid v. University of Cal.,* 105 N.M. 715, 717, 737 P.2d 74, 76 (1987); *Tobeck v. United Nuclear–Homestake Partners,* 85 N.M. 431, 436, 512 P.2d 1267, 1272 (Ct.App.1973). Here, the evidence indicates that Dr. Beever has both a doctorate degree and a master of science degree in veterinary medicine and surgery and had specialized in animal behavior. Dr. Beever was informed concerning the location where the accident occurred and she reviewed a videotape of the race. Under these circumstances, the trial court could properly determine that the witness was qualified to state her opinion concerning the reasons for the horse's behavior at the time of the accident.

### 3. *Sufficiency of the Evidence*

30. Defendants contend the trial court erred in denying their motion for a directed verdict because Plaintiff failed to establish that his injuries would have been less severe if another type of track rail had been in place at the time of his accident. Defendants assert that Plaintiff failed to introduce any evidence indicating within a reasonable medical probability that a different type of track rail would have lessened his injuries or that the County did not exercise ordinary care in its use of a small gooseneck rail system. Defendants also emphasize that while they presented evidence through Drs. Harry L. Schmidt and Vaughn P. Adams that a Fontana Safety Rail system would not have reduced the extent of his injuries, Plaintiff's engineering and medical experts testified that there was no way to predict the outcome or magnitude of Plaintiff's injuries if a Fontana Safety Rail system had been installed.

31. Responding to this argument, Plaintiff points to the testimony of Richard Fontana, the manufacturer of the Fontana Safety Rail system. Fontana testified that a Fontana Safety Rail system would have made a difference in Plaintiff's injuries because he would not have struck a track pole or gooseneck bar. Plaintiff also presented the testimony of Dr. Derick Swenson, who stated that when Plaintiff was thrown from his horse the back of his head struck the horizontal portion of the gooseneck rail and then he hit the next vertical pole with his chest before subsequently landing on the ground. Dr. Swenson testified that had a Fontana Safety Rail system been in place, Plaintiff would have struck the flat surface of the safety cover with his rear and hips, rather than his head. Dr. Wendell Hull, a medical expert called by Defendants, also testified that where the Fontana Safety Rail system exists, a jockey tends to go over the rail and onto the soft portion of the cover or land in the dirt. Additionally, Dr. Chris L. Sperry, a forensic pathologist, testified that to a reasonable degree of medical probability had a Fontana Safety Rail system been installed at the time of Plaintiff's accident, Plaintiff would not have sustained the type of head and neck injuries that he suffered.

■ 32. The decision of the fact finder will not be disturbed if its decision is supported by substantial evidence which is sufficient to support the judgment. *Sunwest Bank v. Colucci*, 117 N.M. 373, 375, 872 P.2d 346, 348 (1994). Substantial evidence consists of evidence which a reasonable mind could properly accept as adequate to support a conclusion. *Id.; see also Clovis Nat'l Bank v. Harmon*, 102 N.M. 166, 168, 692 P.2d 1315, 1317 (1984).

33. Here, the evidence was sufficient to establish a prima facie showing from which the jury could reasonably find that based upon a reasonable degree of medical probability, Plaintiff's injuries would have been less severe with a Fontana Safety Rail system. Moreover, Plaintiff presented other evidence, including the testimony of Fontana and Ronald G. Banks that prior to the accident they had informed the track operators that the type of rail installed at the track was

dangerous and should be replaced. Thus, the jury in its role as the fact finder could reasonably determine that Defendants were aware of the potential hazard to jockeys arising from the continued use of the rail, and that Defendants failed to take reasonable precautions to protect Plaintiff and other riders from such hazard. *See Sunwest Bank*, 117 N.M. at 375, 872 P.2d at 348.

### 4. Claim of Sovereign Immunity

■ 34. Defendants sought to dismiss Plaintiff's claims on the basis that his claims did not fall within a recognized exception permitting suit against Defendants under the Tort Claims Act. They argue that sovereign immunity is not waived for design defects under Section 41-4-6, because Plaintiff's accident and his ensuing injuries were based on a claim that the track rail was improperly designed and laid out. Defendants argue that liability under Section 41-4-6 must be based upon a claim for injuries which occurred as a result of a physical defect in the premises.

■ 35. Although Defendants correctly argue that the Tort Claims Act does not waive sovereign immunity for negligence claims against the state or a public body where the proximate cause of the injury complained of is shown to stem from one or more design defects, *Rivera v. King*, 108 N.M. 5, 12, 765 P.2d 1187, 1194 (Ct.App.), *certs. denied*, 107 N.M. 785, 765 P.2d 758 (1988), we think it is clear that the injuries alleged here, involving whether the track rail was safe, relate to the "operation or maintenance" of the track. *See id.* (Section 41-4-6 contemplates waiver of immunity due to alleged defects in buildings and is generally intended to permit suit in situations involving premises liability). The trial court in the instant case correctly ruled that failure to correct an alleged hazardous condition caused by an exposed gooseneck rail did not constitute a design defect. *Cf. Fireman's Fund Ins. Co. v. Tucker*, 95 N.M. 56, 58, 618 P.2d 894, 896 (Ct.App.) (absence of guardrail adjacent to roadway held not to be design defect; instead, such omission falls within ambit of alleged negligence in maintenance of highway for which there is a waiver of immunity

under Section 41–4–11), *cert. quashed* (Oct. 9, 1980).

### 5. *Judge's Comments*

■ 36. During Plaintiff's case-in-chief, Dr. Sperry was called as a witness. On cross-examination, defense counsel propounded a hypothetical question to the witness and asked whether he agreed that if a Fontana Safety Rail system had been in place, and if Plaintiff had impacted either the aluminum portion or the flat surface "with his head leading, there is at least the possibility of significant head and neck injuries?" Plaintiff's counsel objected, stating that the question required the witness to speculate. The trial court sustained the objection, stating: "You're asking him to speculate about what your witnesses are going to say." Thereafter, the trial court stated that "[y]ou can ask your hypothetical; but it can't relate to [Plaintiff], because that isn't the way he came off [the horse]." Defendants objected to the trial court's comment when the next opportunity arose, outside the presence of the jury.

■ 37. Defendants argue that the judge's statement had the effect of indicating to the jury the manner in which the accident occurred before Defendants could present their case. Whether an attorney may propound a hypothetical question to an expert witness and the admission of the witness's opinion based thereon is within the sound discretion of the trial court. *State v. Johnson*, 99 N.M. 682, 688, 662 P.2d 1349, 1355 (1983). As a general rule, under SCRA 1986, 11–705 (Repl.1994), hypothetical questions must be based on facts which are already in evidence or upon evidence which the questioner assures the court will be produced and is admissible in evidence. *Sutherlin v. Fenenga*, 111 N.M. 767, 773, 810 P.2d 353, 359 (Ct.App.), *cert. denied*, 111 N.M. 678, 808 P.2d 963 (1991); *see also* SCRA 1986, 13–209 (Repl.1991) (hypothetical question "assumes as true certain facts which may or may not be true"); *Winder v. Martinez*, 88 N.M. 622, 624–25, 545 P.2d 88, 90–91 (Ct.App.1975) (counsel may propound hypothetical questions based on his theory of case if based on evidence which has been or which may be

presented), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1976). If material facts upon which the hypothetical question is constructed are not subsequently presented and admitted into evidence, the opposing party must move to strike the answer to preserve the error for review on appeal. *Sutherlin*, 111 N.M. at 773, 810 P.2d at 359.

38. While we agree that the rulings and comments of a judge before the jury must not intimate the judge's belief or feelings concerning the merits of either party's case or the credibility of witnesses, under the circumstances presented here, the trial court's comments did not constitute reversible error. The jury had been previously shown a videotape of the race which captured the circumstances and manner of Plaintiff's fall. At the outset of the trial, the court instructed the jury pursuant to SCRA 1986, 13–106(6) (Repl.1991) that "[r]emarks, arguments and statements of the lawyers are not evidence; neither are comments of the court." Moreover, defense counsel neither asked the trial court to disregard the court's statement nor submitted a proposed jury instruction to neutralize the alleged error.

### 6. *Denial of Offset*

■ 39. At the request of the Jockeys Guild, Defendants purchased several insurance policies which provided medical and disability benefits on behalf of the jockeys at San Juan Downs. Following his accident, Plaintiff received medical benefits under the policies, totalling approximately $61,000.

40. Defendants filed a motion requesting that the jury award of $400,000 be reduced to $300,000 in accord with the limitation on recovery under the Tort Claims Act and for an offset against the judgment for the amount of medical and disability benefits paid to Plaintiff under the policies obtained by the County. Plaintiff opposed any offset, arguing that the policies had been purchased as a result of negotiations and demands by the Jockeys Guild and, thus, any benefits obtained thereunder constituted a collateral source. The trial court agreed that such benefits were derived from a collateral source and denied any offset.

[25] 41. We think it was error to deny an offset for the value of the benefits derived from the insurance policies provided by Defendants. Plaintiff has not shown, nor does he argue on appeal, that he paid any of the premiums for such policies or that the policies were procured and paid by any one other than Defendants. Instead, he argues the Jockeys Guild negotiated with the track for the County to obtain such coverage on behalf of jockeys who were injured at the track. The collateral source rule is designed to preclude an alleged tort-feasor from setting up in mitigation or reduction of damages that the plaintiff has been compensated by insurance in whole or in part, where such insurance was not procured by the alleged wrongdoer. *Jojola v. Baldridge Lumber Co.,* 96 N.M. 761, 765, 635 P.2d 316, 320 (Ct.App.), *cert. denied,* 97 N.M. 140, 637 P.2d 571 (1981); *see also Aragon v. Brown,* 93 N.M. 646, 648, 603 P.2d 1103, 1105 (Ct.App.1979) (collateral source rule does not apply and defendant is entitled to offset where benefits are shown to derive from defendant or source identified with him).

42. Plaintiff also argues that even if this Court holds that the trial court erred in barring any offset under the collateral source rule and if the $300,000 cap on damages in Section 41–4–19 is constitutional, the $61,000 should be credited against the jury verdict of $400,000, and not credited against the reduced amount of $300,000. This issue need not be addressed because of our disposition of the appeals herein.

### 7. *Claim of Cumulative Error*

43. Because we hold that the trial court erred in refusing Defendants' requested jury instruction on comparative negligence and the cause must be remanded for a new trial, we need not address Defendants' claim of cumulative error.

## PLAINTIFF'S CROSS–APPEAL

### 1. *Request for Post–Judgment Interest*

44. Plaintiff contends that the trial court erred in denying his request for an award of post-judgment interest. He argues that because Section 41–4–19(B) of the Tort Claims Act, which imposes a limitation or cap on the amount of any damage award, does not specifically restrict post-judgment interest, allowance of such interest is authorized. We affirm the ruling of the trial court on this issue. A similar argument was addressed by this Court in *Folz v. State,* 115 N.M. 639, 643, 857 P.2d 39, 43 (Ct.App.), *cert. denied,* 115 N.M. 602, 856 P.2d 250 (1993), where we held that an award of post-judgment interest on judgments against a governmental entity is not permitted under the Tort Claims Act. We conclude that the same result is also applicable here.

### 2. *Meaning of "Single Occurrence"*

[27] 45. Plaintiff claims he is entitled to a judgment in excess of $300,000 because there were two concurrent proximate causes or "occurrences" giving rise to his injuries. In furtherance of this argument, Plaintiff reasons that because there were two separate "occurrences" within the meaning of Section 41–4–19, this factor would result in doubling the $300,000 statutory limit imposed on damages awards under the Tort Claims Act.

46. He argues that in the present case the County's failure to replace its exposed gooseneck rail with a safer system was a proximate cause of his injuries. He also contends that the County's placement of the exit gap constituted a second separate proximate cause which contributed to his injuries.

47. We believe Plaintiff's argument was expressly answered by our Supreme Court in *Folz v. State,* 110 N.M. 457, 465, 797 P.2d 246, 254 (1990). In *Folz* the Court noted that, although the term " 'single occurrence' " is not defined in the Tort Claims Act, where multiple negligent acts or omissions antedate the event giving rise to liability, the term " 'single occurrence' " as used in the Act refers "to all harm that, although proximately caused by a particular risk arising from the concurrent operation of one or more successive acts or omissions on the part of a governmental entity, [is] triggered by a particular event giving rise to liability." *Id.* at 461, 463, 797 P.2d at 250, 252. Thus, under the circumstances existing here, all injuries sustained by Plaintiff, which were alleged to have been proximately caused by successive

negligent acts or omissions that combined concurrently to create a risk of harm to him, constituted a "single occurrence" within the meaning of Section 41–4–19.

*CONCLUSION*

48.   For the reasons discussed herein, the judgment is reversed, and the cause is remanded for trial on the merits.   Defendants are awarded their costs on appeal.

49.   IT IS SO ORDERED.

APODACA, C.J., and BLACK, J., concur.