**Morris R. BUSH, Raymond A. Bush, Plaintiffs,**

v.

**MICHELIN TIRE CORPORATION, Kelsey–Hayes Company, Defendants.**

**Civil Action No. 3:90-CV-858-H.**

United States District Court, W.D. Kentucky, Louisville Division.

Oct. 16, 1996.

F. Thomas Conway, White, Conway & Adams, Louisville, KY, David F. Pratt, Lexington, KY, for Morris R. Bush, Raymond A. Bush.

Timothy D. Martin, Graff, Love & Getty, Louisville, KY, for West American Insurance Company.

K. Gregory Haynes, Michelle Ann Turner, Wyatt, Tarrant & Combs, Louisville, KY, William H McCann, William B. Owsley, Wyatt, Tarrant & Combs, Lexington, KY, Eric H. Holtzman, Hauppauge, NY, for Michelin Tire Corporation.

James G. Bowman, Bennett, Bowman, Triplett & Vitittow, Louisville, KY, for Kelsey–Hayes Company.

## MEMORANDUM OPINION

HEYBURN, District Judge.

The Court now considers numerous evidentiary issues which go to the heart of Plaintiffs' products liability claims.[1] In particular, the Court will consider the potential testimony of George Edwards as well as reconsidering several other related issues. In general, the Court must consider what testimony is relevant and fair for purposes of proving claims under strict liability and negligence. The issues are confusing to say the least. Kentucky courts have struggled through the years to draw lines between relevant evidence and evidence which is unfairly prejudicial or confusing. Because both the facts and the applicable products liability law are critical to these decisions, the Court will restate both briefly.

### I.

This products liability action arises from an accident that occurred when Plaintiffs attempted to mount a 16–inch Michelin LT tire on a 16½ inch rim manufactured by the Kelsey–Hayes Company. Plaintiffs were not trained mechanics or tire experts. On October 9, 1990, they put four new 16–inch Bridgestone tires on one of their vehicles. The removed Michelin tires were probably in substantially used condition and possibly not fit for extended highway use. After replacing the older Michelin LT tires with the Bridgestones, Plaintiffs decided to use one of these removed tires as a spare. Plaintiffs were apparently aware of the statement "MOUNT ONLY ON APPROVED 16–INCH RIMS" on the tire. Whether this statement adequately warned Plaintiffs of the potential dangers involved in mismatching 16–inch tires with 16½–inch rims is a central issue of this case.

Plaintiffs found a rim lying around their farm. They were unaware of where it came from, how long it had been there or how it had been used previously. We have learned since that Kelsey–Hayes manufactured the rim in December 1972; Michelin manufactured the tire in December 1985. Plaintiffs attempted to mount the old tire on the old rim. Plaintiffs knew that a 16 inch tire should be mounted on a 16 inch rim, so they searched the rim to determine the rim's size. The tire rim was stamped with a designation "16.5 × 6.00." Plaintiffs saw this designation but could not determine what it meant with respect to size. Raymond Bush proceeded to compare the found rim with one of the 16″ rims used for the new Bridgestone tires. Concluding that the found rim and the 16–inch rim were compatible, Raymond Bush mounted the used 16–inch Michelin LT tire onto the rim.

Plaintiffs had already mounted the new tires on the existing rims without difficulty. Raymond encountered no difficulty in mounting the spare tire onto the rim. He then rolled it to Morris Bush for inflation. Morris noted that the maximum inflation pressure was 65 psi. He noted no warnings. His first

---

[1]. All of the evidentiary issues are raised by Defendant Michelin Tire Company.

attempt to inflate the tire was unsuccessful; it failed to seat. He then deflated the tire, resoaped it and repositioned it upon the rim. During his second attempt to inflate the tire, it exploded. He was seriously injured.

Much of Plaintiff's case rests upon the expert testimony by George Edwards. Recently the Court requested that Plaintiffs file a concise statement of his conclusions and any research, test results or personal experience which form the basis for those conclusions.

In their response, Plaintiffs state that George Edwards is a tire engineer, having worked in the tire industry for 50 years. His formal education is limited. He was employed in 1946–48 with the Gates Rubber Company in Denver, Colorado; from 1948–50 with the Armstrong Tire and Rubber Company; from 1950–55 with Connare Manufacturing Corporation, a major retreading facility; from 1955 to 1975 he was employed with various corporations involved in the tire and retreading business and he has served as an independent tire consultant since 1975. Since 1983, Edwards has examined, evaluated and testified concerning 90 to 100 mismatch tire cases; 10 to 12 of which have resulted in trials. Within the past two to three years he has testified concerning the mismatch of a Michelin tire of 1982–1983 vintage. He has researched documentation of tire mismatch explosions and he has reviewed and evaluated numerous tire burst tests that others have conducted. He has reviewed and evaluated burst tests done by others, he has conducted burst tests of his own to determine burst pressures as well as the relative strengths and weaknesses of the tire manufacturers' products.

In support of his opinions Edwards relies upon 50 years experience in the tire business as a tire engineer, a tire manufacturer, a tire consultant, his review and evaluation of 90 to 100 mismatch components (tires and rims), and his review of the documentation, research, tests and test results from 1971 until the present time. The tests which Edwards reviewed and relied upon include:

(a) B.F. Goodrich, Tribuzi tests dated 6/18/81,

(b) Wendell Kegg burst tests performed in 1985,

(c) UMTRI tests of 1983–84 and 1990–91,

(d) Colin Testing Laboratory burst tests of 1991,

(e) Standard Testing Laboratory–Richard Fuller burst tests,

(f) 1988 Fort Stockton–James Gardner burst tests,

(g) His own tests performed at the University of Louisville,

(h) TRA Minutes and RMA Minutes that relate to industry knowledge and research concerning the mismatch problem, and

(i) Correspondence of tire manufacturers, automobile manufacturers and others within the tire industry that relate to the tire mismatch problem.

Edwards intends to state that due to defects in the design of the 16½ inch rims and 16 inch tires, mismatches have occurred and continue to occur. He will also express an opinion that the 16½ inch with a fifteen degree taper rim is defective as designed because it allows a 16 inch tire with a five degree taper to be placed upon a rim. He will testify that the tire is defective because in mismatch circumstances the bead as designed by Michelin will not withstand normal burst pressures found in ordinary commercial compressors.

## II.

One cannot conclude the admissibility of testimony without first thoroughly understanding the elements of proof relevant to a negligence or strict liability claim in Kentucky.

Just a few months ago Judge Wellford produced a succinct summary of Kentucky product liability law in *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir.1996). Among other things, he said that to establish a defect in product design, a plaintiff must show something more than that it was "theoretically probable that a different design would have been feasible." *Ingersoll–Rand Co. v. Rice*, 775 S.W.2d 924, 928 (Ky.Ct.App. 1988). A plaintiff must also demonstrate

"more than that a particular injury would not have occurred had the product which caused the injury been designed differently." *Jones v. Hutchinson Mfg. Inc.*, 502 S.W.2d 66, 70 (Ky.1973) (quoting 63 Am.Jur.2d *Products Liability* § 73, p. 79); *Rice*, 775 S.W.2d at 928–29 (citing *Jones*, 502 S.W.2d at 70). "Proof that technology existed, which if implemented would feasibly have avoided a dangerous condition, does not alone establish a defect." *Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 336 (4th Cir.), *cert. denied*, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991).

■ Judge Wellford also noted that like many other state courts, Kentucky courts have encountered difficulty with the meaning of the strict liability concept, "defective condition unreasonably dangerous." Indeed, in *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky.1984), the court stated that for fifteen years "we struggled with the meaning of these words." *McCullough* pointed to *Nichols v. Union Underwear Co.*, 602 S.W.2d 429 (Ky.1980), in interpreting § 402A of the Restatement (Second) of Torts, which had been adopted in Kentucky:

> [T]he question is whether the product creates "such a risk" of an accident of the general nature of the one in question "that an ordinarily prudent company engaged in the manufacture" of such a product "would not have put it on the market."

*McCullough*, 676 S.W.2d at 780 (citing *Nichols*, 602 S.W.2d at 433).

■ There are any number of pertinent considerations which a jury may take into account in deciding product liability cases: (1) feasibility of making a safer product, (2) deviation from industry standards, (3) obviousness of the danger, (4) warnings and instructions, (5) extent and nature of misuse, and (6) inherently unsafe characteristics. *Smith v. Louis Berkman Co.*, 894 F.Supp. 1084, 1092 (W.D.Ky.1995); *McCullough*, 676 S.W.2d at 780.

## III.

■ Plaintiffs want to introduce expert witness George Edwards to testify at trial as to the following opinion: the accident tire manufactured by Michelin in 1985 was defective as designed because the tire bead would not withstand normal burst pressures found in ordinary commercial compressors when mismatched with a 16.5–inch tire rim.[2] Defendant seeks to disqualify Edwards as an expert on this opinion.

■ Edwards does not need to be an engineer with a formal education to qualify as a tire expert. Experience is sufficient to establish expertise. *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994). The key issue in deciding expertise is whether the expert has sufficient experience regarding the opinion to which he will testify. *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995) ("The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.").

Under *Berry*, Edwards must have enough expertise regarding tire mismatch explosions to provide a foundation for his opinion concerning the mismatch explosion at issue here. Edwards has had over twenty years' experience with mismatch problems. He has researched documentation of tire mismatch explosions. He has reviewed and evaluated numerous burst tests. He has personally some tires. He has examined 85–90 tires in the context of mismatch injuries. He has examined other mismatch tests, such as the 1983–84 and 1990 tests conducted at the University of Michigan Tire Research Institute.

■ It is true that Edwards gained his knowledge of mismatch causation from his work as a litigation consultant. The Fourth Circuit has found this fact sufficient to exclude expert testimony. *Thomas J. Kline,*

---

**2.** This Court is making the assumption that Edwards' testimony would constitute an expert opinion. The Sixth Circuit defined an expert opinion as one that is based on some type of specialized knowledge. *Cook v. American Steam-* *ship Co.*, 53 F.3d 733, 738 (6th Cir.1995). Edwards is basing his opinion on his specialized knowledge of tires, tire bead designs and tire mismatch explosions.

*Inc. v. Lorillard, Inc.,* 878 F.2d 791, 800 (4th Cir.1989), *cert. denied,* 493 U.S. 1073, 110 S.Ct. 1120, 107 L.Ed.2d 1027 (1990) (holding that one cannot become an expert "simply by accumulating experience in testifying"). However, the Sixth Circuit has not specifically held this, and other circuits disagree with the Fourth Circuit's categorical exclusion. Further, the Court does not find the Fourth Circuit's rationale persuasive nor does the Court conclude that such a conclusion is appropriate in the circumstances here. Edwards started with a base of knowledge about tires and has built upon it. Edwards' vast experience with the mismatch explosion problems qualifies him to render an opinion in this case. His knowledge, while attained with one avowed purpose in mind, will be most helpful to the jury.

Defendants also say that Edwards' opinion is one developed in hindsight and that his earlier opinions found no fault with the Michelin design. Defendants contend that Edwards' testimony amounts to no more than holding Michelin to a theoretical design specification which Edwards did not develop until years after this accident. Finally, Defendants say that Edwards' testimony should be barred because he does not address whether the alternative designs are safer in the tire, as a whole, rather than just regarding mismatch accidents.

No doubt Edwards' opinions are subject to strenuous attack on various levels. On the other hand, Edwards has plausible responses to most of the attacks. All of these factors go to Edwards' overall credibility. Defendants' last argument, regarding whether Edwards' alternative design would increase safety in the tire as a whole still may become an issue. However, Defendant has yet to present sufficient evidence to make this even a disputed point, let alone to exclude the testimony altogether.

**3.** This analysis assumes that the following sources are going to be used by Edwards in forming his opinion. Edwards may use the information to form his opinion, but he may not introduce specific documents for the truth of them. If Plaintiffs are planning on introducing these as exhibits, there will be separate authenti-

### IV.

Defendant raises objections to some of the materials Edwards offers in support of his opinions. Expert testimony is admissible if it satisfies the two-part test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). First, the testimony must be reliable, and, second, the testimony must be relevant. *Id.* at 589, 113 S.Ct. at 2795 ("[U]nder the [Federal] Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable."). This Court grants Defendant's motion as to some of Edwards' anticipated testimony, and denies it (with qualifications) as to the rest.[3]

#### A. *1983 UMTRI Study*

Plaintiffs want to use 1983–84 mismatch tire burst testing conducted for the Budd Company at the University of Michigan Transportation Research Institute (UMTRI) to show that a stronger tire bead, which would not have fractured under pressure, was available to Defendant in 1985 and that Defendant was aware of how to create such a bead in 1985. The 1983–84 tests involved some of Defendant's tires which had a 21-strand bead. The accident tire had a 19-strand bead.

Defendants do not appear to argue strongly that either the 1983 or 1990 UMTRI tests are so unreliable as to inadmissible. In these tests there appear to be much stronger guarantees of reliability than in burst tests discussed in Section IV.C. Importantly, Defendants have access to all the test data in order to properly test its reliability and relevance. This is the type of test upon which an expert might reasonably rely.

Michelin argues that the tests are not relevant because the tires tested were different than the accident tire (tube type 7.50 size 16 inch tires were tested, rather than the tubeless tires involved in Plaintiff's accident).[4]

cation problems to deal with under FRE 901 as well as other hearsay problems which the Court has yet to consider.

**4.** According to Defendant, the tires tested at UMTRI did not require the same airtight compression fit against the rim that a tubeless tire does.

Edwards claims that the difference in tires is irrelevant; only the bead matters. While Plaintiff argues that dissimilarities in testing conditions is an issue of credibility for the jury, the Sixth Circuit in *Cook v. American Steamship Co.*, 53 F.3d 733, 737–38 (6th Cir. 1995), discussed the district court's "gatekeeper function" and emphasized that the evidence must be reliable and relevant to be admitted. To show reliability of the tests, Edwards opines that it was the 21–strand bead in the tested tires that accounted for the higher burst pressures. However, Edwards must offer some foundation for this conclusion. If he can do so, Edwards will be allowed to use the tests for the purpose of showing that Michelin had available and knew of an alternative design in 1984. The jury will be advised that Michelin acknowledges the existence of the design.

Defendants suggest that *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 225–226 (6th Cir.1996) counsels that it would be in error for this Court to allow Edwards to make a comparison between the two different types of Michelin tires. However, the Court believes that there are less significant differences between the two tires at issue here than between the two sets of brakes on entirely different models of bulldozers as was the case in *Brock*. In addition, this Court's requirement that Edwards make a showing of substantial similarity between the two different tires further ensures the relevance of the burst tests. Therefore, the holding in *Brock* does not require the exclusion of the 1983–84 UMTRI tests.

The jury will be advised that the 1983–84 UMTRI tests may not be used as evidence of Michelin's actual knowledge of the performance characteristics of the 21–strand bead at the time of manufacture, since the test results were not released until 1990.

Defendant also asserts that the tested tires had a larger bead wire circumference than the accident tire did. Defendant opines that the larger circumference could have permitted their beads to travel further up the 15 degree slope of the flange on a 16.5–inch rim before breaking, which could account for their higher burst pressures.

### B. *1990 UMTRI Tests*

Plaintiffs want to use 1990 mismatch tire burst testing conducted for the Budd Company at the University of Michigan Transportation Research Institute. Defendants have access to all the test data from which they can adequately test its reliability.

■■ Edwards' purpose in using these tests is to show an alternate, safer bead designs in 1985. He has not tested the 1985 Goodyear tires.[5] He uses the 1990 Goodyear tire tests to make conclusions about 1985 Goodyear tires. Before Edwards may do this, he first must show that the hexagonally-shaped single strand bead tested in 1990 was substantially the same as the one used by Goodyear in 1985. If Edwards can present enough evidence to suggest that this may be true, the Court will allow Edwards to give his opinion why the Goodyear tires are similar and then discuss this aspect of the 1990 UMTRI tests. Under these conditions, the tests may be helpful to show industry standards and feasibility in 1985; however, the tests cannot be used to show Michelin's knowledge of a safer tire.

■■ The 1990 UMTRI studies also tested Michelin tires. Plaintiffs say that the tests show that the Michelin metric sized 16–inch tire with the 19–strand bead (which was used on the accident tire) burst when mismatched on 16.5–inch rims between 79 and 92 psi. Michelin claims the tests should not be admitted to show these results because Michelin does not dispute them; however, FRE 401 defines relevant evidence as that which tends to prove "any fact that is of consequence to the determination of the action." It does not require that the fact be in dispute. Edwards may use this part of the test to support his conclusions.

The tests are not relevant to show Michelin's notice of a superior bead design, because the test results were not released prior to

5. Edwards admits that he has done no air pressure burst testing on any tire manufactured by Goodyear before the 51st week of 1985. He also stated that he was not aware of any air pressure burst tests conducted by anyone on a Goodyear single strand bead tire manufactured prior to the 51st week of 1985. (Edwards depo., at 115–16).

1990. In addition, any test results that do not go directly to one of the purposes described above cannot be used as a basis for Edwards' testimony.

## C. *Other Burst Tests*

 Edwards apparently relies on a number of other burst tests in forming his opinion.[6] These tests were conducted by third persons under unknown and unascertainable circumstances. Edwards' knowledge regarding the tests is based on information provided to him by various attorneys in the course of litigation. Edwards refers to three specific tests, each of which appear to have serious evidentiary deficiencies.

### 1. *Fort Stockton Test*

The Fort Stockton tests were conducted by Firestone in 1988 solely for the purpose of litigation. There are no published results, no test reports, no written data, hypothesis, protocol or procedure from which to determine whether a scientific method was used. All of Edwards' information about the tests was gleaned from his telephone conversations with other plaintiffs' attorneys from other mismatch cases.

Edwards cannot testify about a test for which no report was furnished to Michelin. While FRE 705 states that an expert "may testify in terms of opinion ... and give reasons therefor without first testifying to the underlying facts or data, unless the court requires otherwise," Michelin must at least have access to this data in order to conduct effective cross-examination.

### 2. *Wendell Kegg Test*

The Wendell Kegg tests were conducted in 1985 in the context of other mismatch litigation. The tests produced a one page document listing burst pressure readings for certain tires tested. Neither Edwards nor Defendant has any information about conditions of the tires and rims used, the lubri-

cant used, how the lubricant was applied, the test equipment, how test was monitored and what measures were taken to ensure accuracy. Edwards is relying solely on this one page document.

### 3. *Colin Laboratories Test*

The Colin Laboratories tests were conducted in 1991 and produced a one page document containing burst pressure readings. Neither Edwards nor Defendant has information about test procedures or conditions. Edwards is relying solely on this one page document.

### 4. *Summary*

This Court finds serious problems with all three tests. An expert may rely on evidence that is otherwise inadmissible in forming his opinion, if it is the type that is reasonably relied on by experts in that field.[7] The Sixth Circuit has placed limitations on the type of research on which an expert can rely for his opinion.

In *American & Foreign Ins. Co. v. General Elec. Co.*, 45 F.3d 135, 139 (6th Cir.1995), the Sixth Circuit affirmed the trial court's exclusion of expert testimony which relied on testing in which there were questions regarding how the tests were conducted. The raw data from the tests was not preserved and the instruments had not been calibrated. In addition, the expert relied on substantial testing that had been done at other times for other purposes. For these reasons, the trial and appeals courts found the testing inadequate to support the expert opinion.

Similarly in this case, Edwards gleaned information about the tests from the Plaintiffs' attorneys in various other cases. As a result, neither he nor the Defendants have any personal knowledge of the protocol, procedures, or raw data from the tests. Plaintiffs, in this case, have offered no evidence of peer review or otherwise to show the reliabil-

---

**6.** The Court has already ruled that Edwards' own 1989 burst tests are inadmissible and cannot form a basis for his opinions. He admits that he did not follow any scientific protocols and he retained no records or verification of his results or conclusions.

**7.** FRE 703 provides: "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

ity of the test results. This type of research is inadequate to support an expert opinion. Edwards cannot refer to it or rely upon it as a basis for any opinion.[8]

### D. *History and Development of Tire Industry*

■ Edwards seeks to testify about technological developments in the tire industry which concern the industry standard, custom and practice as well as the availability of alternate, safer bead designs at the time of manufacture. All of these factors are relevant under Kentucky products liability law.[9] Specifically these developments support Edwards' opinion of the defective nature of Michelin's bead design.

Edwards appears qualified to give his opinion on the tire industry side of 1984. As a tire consultant, Edwards has kept abreast of the latest developments within the tire industry. Edwards has relied on promotional brochures, advertisements, experiments done on tires he has purchased over the years and statements made by other tire expert witnesses in depositions taken in other litigation.

■ Edwards may rely on the above sources, except for the information he gleaned from depositions in other cases. For the most part, Edwards has been able to name the expert making the various deposition statements, but not the actual case. This has made it difficult for Defendant to sufficiently prepare for cross-examination.

Also, FRE 703 is not a hearsay exception. That is, Edwards cannot introduce facts regarding industry developments simply to prove the developments existed. According to *Engebretsen v. Fairchild Aircraft Corp.* 21 F.3d 721, 728 (6th Cir.1994):

> Rules 702 and 703 do not ... permit the admission of materials relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible.

Edwards only may use those facts as a basis for his opinion that alternate designs were available, feasible and reasonable to implement.

To be sure this is a distinction which is difficult to grasp and even more difficult to maintain during the course of deliberation. However, it is absolutely true that such information is less reliable and less verifiable than admissible evidence. It is only fair that the jury be told that they may not, therefore, rely upon it in the same manner. The Court will be vigilant to caution the jury to use Edwards' assertions only to assess his opinion and not to accept any hearsay statements of fact solely for the truth of the matter asserted.

### E. *RMA and TRA Minutes and Correspondence*

■ The Court previously excluded the minutes and correspondence at the Rubber Manufacturers Association ("RMA") and the Tire and Rim Association ("TRA"), based upon Plaintiffs' inability to authenticate them. The Court must re-evaluate those conclusions in light of its discussion in Section IV.D. of this memorandum.

Edwards may use the minutes and correspondence relating to meetings of the RMA and the TRA as a basis for his opinion regarding industry knowledge of the dangers of mismatch accidents. However, he may use it only to show industry concern prior to and at the time of manufacture.

According to *Sexton v. Bell Helmets, Inc.,* an allegedly defective design should be measured against a standard articulated, in part, by the industry at the time of manufacture. 926 F.2d 331, 336–37 (4th Cir.1991) (applying Kentucky products liability law). The fact that the industry had expressed concern over the mismatch accidents at the time Michelin manufactured the accident tire goes to whether Michelin adopted an unreasonably

---

**8.** The Court is unaware of what information is available on the B.F. Goodrich, Tribuzi tests dated 6/18/81 and the Standard/Fuller burst tests.

**9.** *Brock v. Caterpillar, Inc.,* 94 F.3d 220, 224 (6th Cir.1996) (feasibility), *Nichols v. Union Under-*

*wear Co.,* 602 S.W.2d 429, 433 (Ky.1980) (industry standard); *Jones v. Hutchinson Manufacturing, Inc.,* 502 S.W.2d 66, 69 (Ky.1973) (industry custom and practice).

dangerous design. However, the Court will need to review the minutes to determine whether they are sufficient to suggest an industry standard or concern about mismatch accidents. If the minutes do not suggest such a standard or concern, the Court may bar any reference to them.

Plaintiffs cannot use the minutes and correspondence to show that Michelin actually knew about the risks of mismatch accidents at the time of manufacture, since they have made no showing that Michelin was actually present at the TRA and RMA meetings in which the concern was discussed.

## V.

Defendant anticipates that Plaintiffs will rely on evidence of bead designs which post-date the manufacture of the accident tire to show that an alternative safer design was feasible in 1985. Evidence of subsequent bead designs falls into three categories: (A) Defendant's test marketing of its 21–strand bead design in 1983, (B) Other manufacturers' subsequent bead designs, and (C) Defendant's subsequent bead designs.

### A. *Defendant's test marketing in 1983*

■■■ Michelin tested a 21–strand bead prior to 1985, well before the date of the accident and the date of manufacture. As a result, evidence of such testing does not fall within the ambit of FRE 407 ("Subsequent Remedial Measures") and cannot be excluded under that rule. As previously discussed, any testing done at, and prior to, the time of manufacture is relevant to a number of issues in the case.

■■■ In a design defect case, the proper date of inquiry for determining relevance is the date of manufacture because the principal question involved is the reasonableness of the defendant's design at the time of the product's manufacture. *See Raymond v. Raymond Corp.*, 938 F.2d 1518, 1524 (1st Cir.1991); *Elliott v. Brunswick Corp.*, 903 F.2d 1505 (11th Cir.1990), *cert. denied*, 498 U.S. 1048, 111 S.Ct. 756, 112 L.Ed.2d 776 (1991); *Gauthier v. A.M.F., Inc.*, 805 F.2d 337, 338 (9th Cir.1986); *Grenada Steel Indus., Inc. v. Alabama Oxygen Co.*, 695 F.2d

883, 888 (5th Cir.1983). No one has suggested that further tests should have resulted in a recall of existing tires. Any testing which took place after the date of manufacture (*e.g.*, the 1985–86 tests), therefore, is not relevant.

### B. *Other manufacturers' subsequent bead designs*

■■■ Under Rule 401, relevant evidence must "make the existence of any fact *that is of consequence* ... more or less probable." (Emphasis added). The Fifth Circuit addressed the admissibility of other manufacturers' subsequent bead designs in *Grenada Steel*, 695 F.2d at 883: "We fail to see how an alternative design, developed by another person years after the product in question was manufactured, is relevant to whether the product is reasonably safe at the time it was made." The same reasoning applies in this case. Therefore, Plaintiffs may not introduce evidence of bead designs used by other manufacturers after 1985, unless Plaintiffs can show that the same bead design was used by the manufacturer on or before the date of manufacture as discussed in Section IV B.

### C. *Defendant's subsequent bead design*

Plaintiffs wish to introduce evidence that in 1991 Defendant made its 21–strand bead standard in all of its 16–inch tires. Plaintiffs contend that the bead design adopted in 1991 is the same as or similar to the one Defendants began testing in 1984, and is, therefore, relevant to show the unreasonableness of the earlier decision and the feasibility of the safer one. Defendants say that the evidence is excluded by FRE 407 ("Subsequent Remedial Measures"). Before addressing the validity of this claim, this Court must decide whether to apply the federal or state rule of evidence.

#### 1. *Does the federal or state rule of evidence govern?*

■■■ Plaintiffs want the Kentucky rule applied to this case, so that they can introduce evidence of Defendant's subsequent bead designs. Defendants want the federal

rule to apply because they believe the federal rule would exclude such evidence.[10]

For support, Plaintiff cites to a Tenth Circuit case, *Moe v. Avions Marcel Dassault–Breguet Aviation,* 727 F.2d 917, 932 (10th Cir.), *cert. denied,* 469 U.S. 853, 105 S.Ct. 176, 83 L.Ed.2d 110 (1984), which holds that the announced state rule in variance with "Rule 407 is so closely tied to the substantive law to which it relates (product liability) that it must be applied in a diversity action in order to effect uniformity and to prevent forum shopping."

However, most of the remaining Circuits to consider this issue have invoked the federal rule over a corresponding state procedural rule. The First, Third and Seventh Circuits have all held that FRE 407 is sufficiently procedural in nature so that the federal rule should apply in diversity cases. *See Kelly v. Crown Equipment Co.,* 970 F.2d 1273, 1277–78 (3d Cir.1992); *McInnis v. A.M.F., Inc.,* 765 F.2d 240, 245 (1st Cir.1985); *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 472 (7th Cir.1984). In addition, the Fifth Circuit applied FRE 407 in a diversity case, *Grenada Steel Indus. v. Alabama Oxygen Co.,* 695 F.2d 883, 885 (5th Cir.1983), and the Ninth Circuit stated explicitly that: "In diversity cases, we apply the Federal Rules of Evidence when, as here, they cover the points in dispute." *Gibbs v. State Farm Mut. Ins. Co.,* 544 F.2d 423, 428 n. 2 (9th Cir.1976). The Sixth Circuit has not yet ruled on this issue.

This Court is persuaded by the reasoning of those courts concluding that FRE 407 is procedural. The Third Circuit points to *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), for the rule that "where a conflict arises in a diversity case, a federal rule of procedure falling within the uncertain area between substance and procedure, must be applied if it is rationally capa-

ble of classification as either." *Kelly v. Crown Equipment Co.,* 970 F.2d 1273, 1277 (3d Cir.1992). Noting the Tenth Circuit's decision in *Moe,* the court responds: "The fact that Rule 407 represents a substantive judgment intertwined with procedural considerations ... does no more than place the rule in 'the uncertain area between substance and procedure.'" *Id.* (quoting *Hanna v. Plumer,* 380 U.S. at 472, 85 S.Ct. at 1144).

The Seventh Circuit characterized "Congress's judgment that juries are apt to give too much weight to such evidence" as "a procedural judgment ... that is, a judgment concerning procedures designed to enhance accuracy or reduce expense in the adjudicative process." *Flaminio v. Honda Motor Co.,* 733 F.2d 463, 471 (7th Cir.1984). As with the Third Circuit, the court admitted that Rule 407 had substantive consequences, but found that "this just puts the rule in that borderland where procedure and substance are interwoven." *Id.*

The First Circuit noted that Congress clearly intended the Federal Rules of Evidence to apply in diversity cases, pointing out that "where Congress deemed it desirable for state rules to be applied in diversity actions, it created a special proviso to that effect in the federal rule." *McInnis v. A.M.F., Inc.,* 765 F.2d 240, 245 (1st Cir.1985) (citing FRE 501 as an example).

While *Moe*'s argument that FRE 407 is substantive in nature has strong appeal, the fact that the rule has substantive implications is not reason enough to apply the state rule in this case. Many of the federal rules have substantive consequences. If courts began examining each rule individually, they would wreak havoc on the otherwise uniform set of rules. Consequently, the Court will apply the federal rule in this case.

---

**10.** FRE 407 provides: "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." It should be noted that the Sixth Circuit applies FRE 407 to strict liability product design cases. *See Cox v. General Elec. Co.,* 302 F.2d 389, 390 (6th Cir. 1962); *Northwest Airlines, Inc. v. Glenn L. Martin Co.,* 224 F.2d 120, 130 (6th Cir.1955), *cert.*

*denied,* 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818 (1956).

KRE 407 provides: "When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence in connection with the event. *This rule does not require the exclusion of evidence of subsequent measures in products liability cases ....*" (Emphasis added).

### 2. *Michelin's subsequent bead designs*

In addition to Plaintiffs' argument that KRE 407 should be applied (and subsequent bead designs should be admitted under its exception), Plaintiffs argue that FRE 407 is not applicable because Michelin's designs are neither subsequent nor remedial; and, in the alternative, that the FRE 407 feasibility exception should apply.

#### (a) *Remedial*

■ Plaintiffs point out that Defendant claims the later bead designs were adopted for reasons of efficiency, not safety. From this, Plaintiff concludes that the measures were not "remedial." However, FRE 407 defines "subsequent remedial measures" as "measures ... taken which, if taken previously, would have made the event less likely to occur." The rule's language does not go to Defendant's intent in adopting the later measures. It simply asks whether the later measures could have prevented the earlier accident. Both parties seem to be in agreement that the answer to this question is yes. Therefore, Defendant's later bead design is sufficiently "remedial" to fall under FRE 407.

#### (b) *Subsequent*

■ Plaintiffs make a more convincing argument that the 1991 bead design is not "subsequent" because Plaintiff was designing the bead at the time of the accident.[11] The rule's language seems concerned only with those measures actually "taken" after the accident. However, Plaintiffs cite to a First Circuit case holding that where the designs were on the drawing board at the time of the accident, the design is not "subsequent" and does not fall under FRE 407. *Raymond v. Raymond*, 938 F.2d 1518, 1523–24 (1st Cir. 1991).

Even so, that court ultimately held that "the introduction of evidence of pre-accident design modifications not made effective until after the manufacture of the allegedly defective product may reasonably be found unfairly prejudicial to the defendant and mislead-

ing to the jury for resolving the question whether the product was unreasonably dangerous at the time of manufacture and sale." *Id.* Introduction of such evidence is likely to encourage Monday-morning quarterbacking among the jurors. In addition, the Third Circuit has ruled that FRE 407 excludes subsequent design change evidence after the manufacture of the product but before the accident. *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191 (3d Cir.1987); *Kelly v. Crown Equip. Co.*, 970 F.2d 1273, 1276–77 (3d Cir. 1992). The Seventh Circuit has also excluded charges made after the accident, even though the decision to make the charge took place before the accident. *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1060 (7th Cir.1987). This court finds the reasoning of the Third and Seventh Circuits persuasive.

Plaintiffs also argue that Michelin had already adopted the 21–strand bead at the time of manufacture and, therefore, the adoption of the 21–strand bead in all tires was not "subsequent." While it is true that Plaintiff was using the 21–strand bead with some of its heavy duty 16–inch tires, the Court has already found this evidence relevant and admissible. However, Plaintiff also wants to introduce evidence that Michelin subsequently adopted the 21–strand bead in all of its tires. The decision to make the design "standard" for all tires was surely "subsequent" to the accident. One's analysis must focus on the time of the change, not the time the design was feasible. Since the 1991 measure was taken subsequent to the accident, FRE 407 applies.

#### (c) *Feasibility*

■ Finally, Plaintiffs argue that the subsequent bead design should come in under the FRE 407 exception, which allows subsequent remedial measures to be admitted if they go to the feasibility of the design and if feasibility is controverted. Defendant says that it does not intend to contest feasibility and that, therefore, evidence going to it is irrelevant.

Plaintiff argues that because Defendant discusses the complexity and expense of

---

**11.** Defendant employed the 21–strand bead on a test basis in 10,000 of various load range tires in 1984, at least one year before the manufacture of

the accident tire. It then used the 21–strand bead in 350,000 of such tires in 1986 and 1987.

adopting the 21–strand bead, it is essentially contesting feasibility. However, several other courts have concluded that discussing the trade-offs in taking precautionary measures does not necessarily place feasibility in issue. *See, e.g., Gauthier v. A.M.F., Inc.,* 788 F.2d 634, 638 (9th Cir.1986); *see also Flaminio v. Honda Motor Co.,* 733 F.2d 463, 468 (7th Cir.1984). In *Gauthier,* the defendant argued that although the safer design was feasible, the risks were not significant enough to offset the increased complexity of the design and the resulting consumer frustration. *Gauthier,* 788 F.2d at 638. Similarly, in this case, Defendant should be able to discuss the trade-offs in order to argue that its design was not unreasonably dangerous. If plaintiffs in products liability cases were allowed to introduce subsequent remedial measures whenever a defendant was forced to argue about the trade-offs of alternative designs, the "feasibility" exception to FRE 407 would swallow the rule. *See Flaminio,* 733 F.2d at 468.

■ "Feasibility" is relevant to a strict liability case because if no alternative design existed at the time of manufacture, then a jury may consider whether the existing design meets the industry standard. Even if a new design is "feasible," a defendant might still suggest that it made a logical decision not to implement it and that the existing design was reasonably safe for its intended uses. Typically, "feasibility" concerns the ability of a manufacturer or designer to overcome technological and scientific obstacles in marketing a product. From that prospective, feasibility is not disputed in this case. The design existed in 1983. It could be mass produced. The only remaining issues concern why Defendants chose not to use the design on all of its tires in 1983. This question raises issues of testing and cost compared to the urgency of the need for the change or the significance of the misuse as well as other relevant factors.

All these issues may be argued without reference to the 1991 standard design change. Excluding the evidence of the change only prevents Plaintiff from arguing

that because the design was changed in 1991, the 1984 design must have been defective. This is precisely the type of argument which FRE 407 by its language and its policy seeks to bar.

Evidence of subsequent design changes has marginal relevance as to whether a product was defective at a previous time, particularly when a defendant does not contest the feasibility of the change. FRE 407 expressly rejects the inference that fault is admitted when remedial measures are taken. The reason is that in this case and in other cases, actions taken long after an event are equally consistent with the injuries occurring by accident or by contributory negligence as they are a result of a defective product. For these reasons, the Court believes that where Defendants will stipulate to feasibility, as is the case here, introduction of a subsequent standard design change should be prohibited. *See Raymond v. Raymond Corp.,* 938 F.2d 1518, 1523 (1st Cir.1991).

Nevertheless, the Court is concerned that Defendants' argument may directly or indirectly imply that to change the design standard in 1984 was impractical. Such an argument would too closely question feasibility. To avoid this unfairness, the Court will require Defendants to tender a written proffer explaining why the design existing in 1983 or 1984 was not used in all tire models. Defendants may lay out the reasons for not adopting the new design and it may assert that the existing design was acceptable. The Court will consider whether the proffer avoids contesting feasibility before finally excluding the evidence of a subsequent design change. Assuming that such evidence is excluded, the Court nevertheless reserves the right to admit evidence of subsequent design changes if Defendants appear to be arguing feasibility either directly or indirectly.[12]

## VI.

■ The Court has also reviewed the issue of whether accidents subsequent to the

12. The Court reserves the right to reconsider the issue should any testimony by Defendants' experts require impeachment by showing the subsequent design change.

one at issue are admissible in this case.[13] The Court now concludes that subsequent accidents which are substantially similar to the one at issue are admissible to show causation and the dangerousness of the product at the time of the manufacture.

In Kentucky products liability design defect cases evidence of similar accidents does not go to notice of a dangerous condition since a manufacturer is presumed to know all of the inherent characteristics of its product including its dangerous propensities. *Montgomery Elevator Co. v. McCullough,* 676 S.W.2d 776, 783 (Ky.1984). Therefore, "evidence of similar product failures under similar conditions is relevant and admissible ... 'to show the danger (of the product) and the cause of the accident.'" *Id.* Because the evidence is introduced to show dangerousness and causation, and not to show an awareness of a danger, it stands to reason that evidence of subsequent similar accidents is no less relevant than evidence of prior ones.

The Kentucky Supreme Court, in *Montgomery,* made no distinction between prior and subsequent accidents. In reviewing the admissibility of prior accidents, the Sixth Circuit noted that: "[t]he state of the law regarding the admissibility of prior or subsequent similar accidents has been described as [being] in 'a state of hopeless disorder,'" *Bryan v. Emerson Elec. Co.,* 856 F.2d 192 (6th Cir.1988), failing to distinguish between the two. Judge Weinstein similarly makes no distinction between the admissibility of prior and subsequent accidents. *Weinstein on Evidence* sec 1:401[10].

Most circuits have held that subsequent accidents are admissible to prove causation and dangerousness of a condition, if a proper foundation is laid. *See, e.g., Exum v. General Elec. Co.,* 819 F.2d 1158 (D.C.Cir.1987) ("[A]lthough subsequent incidents cannot be introduced to prove the manufacturer had notice, they are relevant to show dangerousness."); *Weeks v. Remington Arms Co.,* 733 F.2d 1485, 1491 n. 10 (11th Cir.1984) ("We note that this circuit has previously held evidence of subsequent accidents relevant to

the issue of causation."); *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 617 (5th Cir. 1977) ("While an accident occurring after the one under investigation might not have been relevant to show defendant's prior knowledge or notice of a product defect, it may have been highly relevant to causation, the critical issue in this case."); *Kanelos v. Kettler,* 406 F.2d 951, 956 n. 30 (D.C.Cir.1968) ("Our decisions, however, have not attached any significance to whether, when offered for this purpose [to show dangerous condition], the accident sought to be shown took place before or after the accident out of which the lawsuit arose.").

Those Kentucky courts which have admitted evidence of other accidents or product failures, have uniformly done so "where there was a sufficient similarity of conditions and the evidence was not so technical as to cause undue confusion or waste of time." *Rhodes v. Michelin Tire Corp.,* 542 F.Supp. 60, 62 (E.D.Ky.1982). Therefore, Plaintiffs must lay a foundation showing that the subsequent mismatch accidents were substantially similar in circumstances to the Bushes' accident so as to be relevant. *Id.* (requiring that plaintiffs show that the other accidents occurred "under substantially similar conditions"). Prior to the commencement of trial, Plaintiff shall file a description of each substantially similar accident upon which they intend to rely. The trial court has great latitude in admitting or excluding evidence of subsequent accidents to show causation and danger of the product. *Rye v. Black & Decker Mfg. Co.,* 889 F.2d 100, 101–102 (6th Cir.1989). The jury will be advised that the subsequent accidents may not be used as evidence of Defendants' actual awareness of or notice of a dangerous condition.

During the trial the Court will set aside several hours to conduct a further inquiry into several elements of proof which Edwards must establish.

With respect to any number of these issues, the Court has concluded that evidence may be relevant as to one issue and not relevant as to others. In order to avoid

---

**13.** The Court previously concluded that substantially similar mismatch accidents occurring prior to this accident were relevant and admissible in this case.

confusion the Court intends to give the jury an explanatory or cautionary statement about the uses of potentially confusing evidence. The parties are invited to submit brief proposals for such statements prior to trial. Moreover, the Court will not be responsible for determining every occasion on which such statements are necessary. Therefore, the Court will rely upon the parties to request statements where they deem appropriate.

### ORDER

This case is before the Court to consider various evidentiary issues. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion in limine is SUSTAINED in part and DENIED in part consistent with the accompanying Memorandum Opinion.